DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Grafton Cable Communications, Inc. ("Grafton"), appeals from a bench trial decision of the Lorain County Court of Common Pleas, which denied its counterclaims and awarded judgment to Plaintiff-Appellee South Shore Cable Construction, Inc. ("South Shore"). South Shore has cross-appealed certain aspects of the trial court's decision. We affirm in part and reverse in part.
 I {¶ 2} As this is essentially a dispute over unpaid invoices, we begin with a simplified and practical characterization of the two parties and their relationship. Grafton owns and operates certain cable television and internet lines, meaning the actual cables that carry the signal, either aboveground or underground. South Shore is a contractor that installs these types of cables. South Shore has worked for Grafton for years, installing their lines. There have been no written contracts, but merely an oral understanding that South Shore would complete the work as requested and invoice Grafton accordingly.
 {¶ 3} This dispute stems from a single, large reinstallation project in which, without written contract, Grafton hired South Shore to install lines throughout six residential developments: Wellington, Grafton, Flint Ridge, River Ridge, Castleton, and Pheasant Run. This project totaled nearly $1.85 million in invoices from South Shore, of which Grafton paid $1.54 million without objection. However, in the fall of 2001, Grafton reportedly became dissatisfied with South Shore's work and stopped paying its invoices. Seventeen particular invoices went unpaid, for an amount totaling $305,031.96. Grafton's General Manager later explained that he stopped paying these invoices in an effort to compel South Shore to remedy what he viewed as widespread problems in the system, arising under previously paid invoices as well as some of the seventeen at issue.
 {¶ 4} In May 2002, South Shore sued Grafton to recover the $305,031.96 due on the seventeen outstanding invoices. Grafton responded with an answer and a counterclaim. In its answer, Grafton admitted that it did not pay the seventeen invoices, but sought a set-off as an affirmative defense based on what it alleged was the unacceptable quality of work performed by South Shore. In its counterclaim, Grafton asserted six separate claims totaling $1.1 million, arising from the entire project and not limited to or dependant on the seventeen particular invoices: (1) breach of fiduciary duty; (2) fraud; (3) conversion; (4) unjust enrichment; (5) breach of contract; and (6) negligent breach of contract. Grafton also sought an additional $1 million in punitive damages and attorneys' fees. South Shore denied the allegations and asserted its own affirmative defenses.
 {¶ 5} A four day bench trial began on September 2, 2003. On September 30, 2003, the trial court issued its decision in a journal entry. The journal entry began by addressing Grafton's first four counterclaim causes of action and concluded that Grafton had failed to prove any of them by a preponderance of the evidence. Thus, those claims were denied.
 {¶ 6} The journal entry next addressed Grafton's breach of contract and negligent breach of contract causes of action, which encompassed the whole project, implicating some forty-nine invoices and seeking $1.1 million in actual damages. At trial, Grafton had promoted its theory that it had withheld payment of the seventeen invoices due to pervasive problems with the entire cable installation project. Towards that theory, Grafton presented testimony and evidence that alleged thousands of flaws throughout the system. While acknowledging that many of the seventeen contested invoices were themselves acceptable, Grafton extended the dispute well beyond those invoices by producing testimony and evidence to contest numerous paid invoices received prior to those seventeen. However, the trial court was not persuaded, and in the journal entry it went on to consider only the seventeen invoices at issue pursuant to South Shore's breach of contract. Thus, Grafton's entire counterclaim was denied.
 {¶ 7} Finally, the trial court considered South Shore's claims on each of the seventeen invoices. The court began by noting that at trial Grafton had not contested several of the invoices, but on those that were contested Grafton was entitled to a certain quality of work even without a written contract. In the journal entry, the trial court individually addressed each invoice, weighing South Shore's claim and Grafton's affirmative defense. The trial court found nine of the seventeen to be without dispute and awarded the full amount to South Shore. The court reduced two invoices by a 100% set-off (#1831 and 1929), on its finding that the quality of work was insufficient, although each for a different reason. The court reduced two other invoices by a 15% set-off (#1829 and 1836) on its finding that noise in the system was due to the improper attachment of fittings. The court reduced three invoices by a certain dollar amount to comply with South Shore's price list for materials identified on the invoice (#1859, 1861 and 1928). Finally, the court reduced one invoice (#1931) by both a dollar amount, to comply with the price list, and a 15% set-off due to the reported noise. Therefore, after recalculating for a mathematical error, the trial court ultimately awarded South Shore $237,887.20 on its claim for $305,031.96.
 {¶ 8} Grafton has timely appealed, asserting two assignments of error. South Shore has timely cross-appealed, asserting six assignments of error.
 II Assignment of Error Number One
"The trial court erred in failing to extend its findings and conclusions, as applied to invoice 1831, to [appellant's] entire under-ground construction breach of contract/negligent breach of contract claims; the court's failure to do so is contrary to the overwhelming evidence associated with said claims, and is against the manifest weight of the evidence."
 Assignment of Error Number Two
"The trial court erred in not rendering judgment in favor of [Appellant] in the amount of $401,823.00."
 {¶ 9} These two assignments of error present the same substantive argument. Effectively, Grafton Cable has argued that the trial court's denial of its counterclaim is against the manifest weight of the evidence. Specifically, Grafton Cable has argued that because the trial court found in favor of its affirmative defense to invoice 1831, it must necessarily extend this finding to the entire project. We disagree.
 {¶ 10} Grafton insists that logic necessitates the outcome of this issue. That is, Grafton argues that because the trial court found that the cable installation did not comply with the requirements at a portion of Pheasant Run (some 2,305 feet of buried cable), the court awarded Grafton a set-off, which must also apply to other areas of noncompliance: Wellington, Grafton and the remainder of Pheasant Run. This charge implicates some 91,074 feet of buried cable, and 44 invoices for a total invoiced amount of $551,571. Before pointing to a flaw in Grafton's reasoning, it is worthwhile to lay out its complete argument, which unfolds in three successive syllogisms.
 {¶ 11} First, if the underground cable installation is to comply with industry standards, then the cable must be installed 24 inches deep. Grafton argued that the cable at Pheasant Run, Wellington and Grafton was installed too shallow, at an average of eight inches deep (some 66,970.5 feet of buried cable). Therefore, the installation does not comply with the requirements. Next, if the trial court finds that the installation does not comply, then Grafton receives a price set-off. The trial court found that the installation of 2,350 feet at Pheasant Run (billed in invoice #1831) did not comply. Therefore, Grafton received a set-off for the installation of 2,350 feet at Pheasant Run (#1831). Finally, if the set-off applies to one area of noncompliance, then it must apply to all other areas of noncompliance as well. The trial court applied the set-off to the portion of Pheasant Run, and Grafton insists that the three subdivisions were all completely noncompliant. Therefore, the set-off must logically apply to Wellington, Grafton and the remainder of Pheasant Run (representing $401,823 in unacceptable cable installation).
 {¶ 12} Ignoring other possible flaws in the reasoning, we are immediately drawn to the trial court's critical finding of fact, affecting Grafton's first and third minor premises: which areas were proven to be unacceptably shallow and therefore noncompliant. As this is a factual determination made by the trial court, on review, we consider whether it is against the manifest weight of the evidence.
 {¶ 13} The Ohio Supreme Court has established the standard for reviewing an appellant's claim that the trial court decision was against the manifest weight of the evidence. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 280. Furthermore:
"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.
"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." (Quotations and edits omitted.) Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80 n. 3.
That is, "a court of appeals [must] be guided by a presumption that the findings of the trier-of-fact were indeed correct." Id. at 80.
"The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id.; see, also, State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 14} This action is reserved for the exceptional case where the evidence demonstrates that the "trier of fact clearly lost its way and created such a manifest miscarriage of justice that the [decision] must be reversed and a new trial ordered." Statev. Otten (1986), 33 Ohio App.3d 339, 340. Accord State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 15} In the present case, Grafton has argued that the trial court was correct in finding the cable's depth too shallow for the 2,350 feet in Pheasant Run, but erred in failing to extend this finding to the entirety of the three subdivisions (66,970.5 feet of buried cable). Grafton labels this a logical inconsistency, and builds its entire argument from this premise. The trial court's judgment entry states:
"[South Shore] Exhibit 5 (invoice 1831) is for the Underground Rebuild in the Pheasant Runt [sic] Development. It is clear from the evidence presented by [Grafton] that the underground coaxial cable was laid at an average depth of 8 inches. [Grafton] has met its burden of proof as to this invoice, and is entitled to a set-off of $15,180.00 [100% of the invoice]." (Emphasis added.)
Grafton argues that its evidence presented at trial was overwhelming, that the same evidence that proves the depth at this portion of Pheasant Run applied to all three subdivisions, and that its evidence was virtually uncontradicted. Thus, Grafton's brief concludes: "In this case, for some reason, the trial court did not make the logical inference that the proof applicable to invoice 1831 applies with equal force to the other areas where the testimony also proved that South Shore buried the cable less than the necessary depth." (Emphasis added.)
 {¶ 16} On review, we are bound to look for the suspected reason, granting the presumption that the trial court's findings were correct and seeking an interpretation consistent with the verdict. See Seasons Coal, 10 Ohio St.3d at 80. Based on our review of the record, we find it reasonable that the trial court did believe Grafton's "proof as to this invoice," but simply did not believe Grafton's position that all of the areas were too shallow. Foremost, the trial court recognized the contradiction in Grafton's claim, when its General Manager testified that at least one of the implicated invoices (#1855) was "particularly fine," but he was refusing to pay it because of the "global issues with the system." The trial judge appeared troubled by the General Manager's further admission that he did not communicate to South Shore any of the problems he found with the invoices or the system, but merely stopped paying the invoices. The judge interjected frequently into the testimony by Grafton's witnesses, asking for supporting evidence or documentation which those witnesses just as often did not have. All of this undermines the credibility of Grafton's position.
 {¶ 17} Furthermore, certain evidence depicts discrepancies in the means, method and results of the depth testing, including a relatively sparse number of tested locations compared with the total footage alleged and at least one location which was proven to have been misrepresented by Grafton because it had been measured incorrectly. However, with regard to invoice 1831, Grafton presented evidence that one of its subcontractors had actually cut a line at this location which had been buried too shallow and provided the trial court judge with photographs of the exposed line at the improper depth.
 {¶ 18} After reviewing the record, this Court finds it reasonable that the trial court believed Grafton that the 2,350 feet of buried cable in Pheasant Run, associated with invoice 1831, was buried too shallow, and remained unpersuaded as to the remaining areas. We conclude that trial court did not clearly lose its way or create a manifest miscarriage of justice in drawing this distinction and rendering its decision on the totality of the evidence. See Thompkins, 78 Ohio St.3d at 387.
 {¶ 19} Therefore, because Grafton did not prove that the entire 66,970.5 feet of cable installation was noncompliant, it has not, logically, established that it is entitled to a set-off. Grafton's two assignments of error are without merit.
 Cross-Assignment of Error Number One
"The trial court erred in denying statutory interest to [south shore] on the amounts found due and owing on each invoice from the date the invoice was due until payment on the invoice is made."
 {¶ 20} South Shore has argued that the trial court was required to impose prejudgment interest and erred in refusing to do so. We disagree.
 {¶ 21} Decisions on the grant or denial of prejudgment interest are within the discretion of the trial court and will not be disturbed without an abuse of discretion. Wagner v.Midwestern Indemnity Co. (1998), 83 Ohio St.3d 287, 292. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Furthermore, an abuse of discretion is a "perversity of will, passion, prejudice, partiality, or moral delinquency."Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621. Under this standard, an appellate court may not merely substitute its judgment for that of the trial court. Id.
 {¶ 22} In the present case, the trial court denied South Shore's motion for prejudgment interest, but granted interest at the statutory rate from the date of judgment. While South Shore would prefer to receive the prejudgment interest, we find nothing in the record or in South Shore's brief to this Court that persuades us that the trial court abused its discretion in refusing to impose prejudgment interest in this instance. South Shore's first assignment of error is without merit.
 Cross-Assignment of Error Number Two
"The trial court erred in finding that it was clear from [Grafton's] evidence that the underground coaxial cable laid in pheasant run was at an average depth of eight inches, and that [Grafton] therefore met its burden of proof entitling it to a 100% set off to invoice 1831 (px 5)."
 {¶ 23} South Shore has argued that the trial court's denial of this particular claim is against the manifest weight of the evidence. Specifically, South Shore has asserted that the trial court's finding in favor of Grafton Cable's affirmative defense to invoice 1831, which reciprocally found against South Shore's claim on that invoice, was not supported by competent credible evidence. We disagree.
 {¶ 24} As discussed more fully in the analysis of Grafton's two assignments of error above, the trial court's finding on the workmanship of the installation is a factual determination made by the trial court. Therefore, on review, we must determine if it is against the manifest weight of the evidence. C.E. Morris,54 Ohio St.2d at 280. That is, we grant the presumption that the trial court's findings of fact were correct and seek an interpretation consistent with the verdict. See Seasons Coal,10 Ohio St.3d at 80. The trial court stated:
"[South Shore] Exhibit 5 (invoice 1831) is for the Underground Rebuild in the Pheasant Runt [sic] Development. It is clear from the evidence presented by [Grafton] that the underground coaxial cable was laid at an average depth of 8 inches. [Grafton] has met its burden of proof as to this invoice, and is entitled to a set-off of $15,180.00 [100% of the invoice]."
South Shore contests this finding in two respects.
 {¶ 25} South Shore first argues that it was not required to bury the underground cable at a depth greater than eight inches. However, in framing Grafton's affirmative defense, the court had proclaimed: "As a matter of law, [Grafton] is entitled to expect that work would be done in a manner consistent with industry standards." On review of the record, we find that Grafton presented evidence that it understood these cables would be buried 24 inches deep, that it was working from a price sheet in anticipation that it was paying for cable to be buried 24 inches deep, and that South Shore's President testified to its own "Golden Rule" that cable would be buried at least 18 inches deep. Therefore, this Court finds it reasonable that the trial court believed the industry standard to be 24 inches, or at least 18 inches, but not eight inches.
 {¶ 26} South Shore also argues that Grafton's evidence, the study which indicated the average depth to be eight inches, was unsupportable. First, a mere 400 test locations over 2,530 feet of buried cable is an insufficient number to be representative. Next, Grafton did not document the locations of the 400 tests, justify how those locations were selected, or explain how the average was calculated. Finally, Grafton admitted that the testing equipment was inexact, even citing a specific error where a reading of 10 inches was discovered to be 19 inches deep when excavated. In reviewing the entire record and the journal entry, it is reasonable to conclude that the trial court judge was persuaded by the evidence to a certain extent, as the court denied the counterclaim, effectively holding that it disbelieved Grafton's claims as to the remaining 66,970.5 feet. However, in addition to this testing, Grafton presented evidence that one of its subcontractors had actually cut a line in this Pheasant Run location because it had been buried too shallow, and further, provided the trial court judge with photographs of the exposed line at the improper depth. Therefore, this Court finds it reasonable that the trial court did believe Grafton that the 2,350 feet of buried cable in Pheasant Run, associated with invoice 1831, was buried too shallow. As such, we conclude that trial court did not clearly lose its way or create a manifest miscarriage of justice. See Thompkins, 78 Ohio St.3d at 387. South Shore's second assignment of error is without merit.
 Cross-Assignment of Error Number Three
"The trial court erred in denying [South Shore] 100% of the amount of invoice 1831 (px 5), when [Grafton] presented no evidence of the dollar amount of its damages, cost to conform the work to the contract, or difference in before and after value of the work."
 {¶ 27} South Shore has argued that the trial court applied the wrong remedy, and furthermore, did so without sufficient proof. Specifically, South Shore has argued that a 100% set-off was improper and represents the cost of a hypothetical but impractical reinstallation, thus implicating the doctrines of substantial performance, economic waste, and diminution in value. We agree.
 {¶ 28} In the landmark case of Jacob Youngs, Inc. v.Kent, then New York State high court Judge Benjamin Cardozo instituted diminution in value as the appropriate remedy in cases of substantial performance and economic waste. Jacob Youngs,Inc. v. Kent (1921), 230 N.Y. 239. When a contractor sued for payment on construction of a home, the homeowner charged breach of contract and sought to avoid payment because the contractor had installed Cohoes pipe rather than the Reading pipe explicitly specified in the contract. Id. at 240-41. Based on a strict application of the contract language, the homeowner wanted either a free home fully constructed and ready for occupancy (substantial performance), or money to remove the otherwise good pipe in favor of the alternative brand of pipe (economic waste). Judge Cardozo rejected these extremes and crafted a just solution:
"The courts never say that one who makes a contract fills the measure of his duty by less than full performance. They do say, however, that an omission, both trivial and innocent, will sometimes be atoned for by allowance of the resulting damage, and will not always be the breach of a condition to be followed by a forfeiture." (Citations omitted.) Id. at 241.
"In the circumstances of this case, we think the measure of the allowance is not the cost of replacement, which would be great, but the difference in value, which would be either nominal or nothing. * * * It is true that in most cases the cost of replacement is the measure. The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value." (Internal citations omitted.) Id. at 244.
 {¶ 29} Following this reasoning, the settled rule in Ohio for performance of construction contracts is that diminution in value is the proper measure of damages, but restoration cost may be used as an alternative so long as it does not exceed diminution in value. N. Ohio Roofing, Inc. v. Kligler Ent. (May 4, 1977), 9th Dist. No. 2504, at pg. 3, citing Ohio Collieries Co. v.Cocke (1923), 107 Ohio St. 238, paragraph five of the syllabus. "Even when an award somewhat higher than the diminution in value of the property might be appropriate, the restoration costs awarded must not be grossly disproportionate expenditures."Bartholet v. Carolyn Riley Realty, Inc. [Bartholet I] (1998),131 Ohio App.3d 23, 27 (remanding for determination on diminution in value). Thus, absent fraud, determination of diminution in value is effectively a prerequisite to awarding restoration costs. Id. at 25. The party seeking restoration cost bears the burden of proving that it would not be "grossly disproportionate" to diminution in value. Bartholet v. Carolyn Riley Realty, Inc.
[Bartholet II] (Aug. 1, 2001), 9th Dist. No. 20458, pg. 6 (modifying the damage award to the value calculated as diminution in value). If that party fails to present evidence of diminution in value, then the trial court may properly dismiss that party's claim. Smith v. Coldwell Banker Hunter Realty, 9th Dist. No. 20908, 2002-Ohio-4866, at ¶ 18 (finding repair costs of nearly one-half the value of the home to be grossly disproportionate and thus warranting dismissal).
 {¶ 30} In its brief to this Court, Grafton has argued that restoration costs are the appropriate measure, without consideration of diminution in value. Grafton cites three cases as authority. See Pikewood Manor, Inc. v. Monterry ConcreteConstr., 9th Dist. No. 03CA008289, 2004-Ohio-440; Atlas HomesCorp. v. Fyfe (Oct. 24, 1990), 9th Dist. No. 14413; NewarkGardens, Inc. v. Royal Globe Ins. Co., Inc. (Feb. 11, 1982), 10th Dist. No. 81AP-618. However, we disagree with Grafton's assertion and find these cases to be consistent with the rules laid out above. That is, restoration cost is appropriate as an alternative to diminution in value, so long as it does not exceed diminution in value. Nothing in any of the three cases cited by Grafton suggests that the restoration costs exceed the associated diminution in value. Therefore, none of these cases actually furthers Grafton's position.
 {¶ 31} In the present case, Grafton first argued that the harm resulting from the cable's shallow depth was the increased likelihood that the cable would be cut by unsuspecting excavators. However, Grafton documented only one instance when the cable had actually been cut due to its shallow burial, but did not even document the cost of that repair. That is, despite the operation of this cable system for over two years, no other evidence was presented of accidents, cuts, actual damages or harm suffered. Thus, the system remains in operation, as installed, and will seemingly continue in such a state for the duration of its technological life-span, some 10 to 20 years. This is consistent with Grafton's explanation that it would not be cost efficient to dig up the cable and rebury it. From this, we conclude that South Shore substantially completed performance of the cable installation, that Grafton received a benefit from the installation, and that reinstallation would be economic waste. Based on South Shore's trial testimony, consistent explanation, and argument to this Court, we cannot conclude that the shallow burial was done maliciously, deceptively or in bad faith. Furthermore, we acknowledge the judgment entry's express finding that Grafton failed to prove any fraud on its counterclaim, and conclude that this is the type of innocent and essentially trivial defect that Judge Cardoze spoke of in Jacob Youngs,230 N.Y. at 241.
 {¶ 32} Notably, Grafton also explained its collateral concern, which would be the need to disclose the insufficient depth of this cable to potential future purchasers of this system and would necessitate a price reduction. This not only expresses an understanding on Grafton's part that diminution in value was a relevant consideration, but that Grafton had a means to quantify that diminution in value. Grafton had the burden of proving diminution in value as the measure of damages before the trial court could reasonably award restoration (reinstallation) costs and set-off 100% of the invoice. See Bartholet I,131 Ohio App.3d at 25. Therefore, as a matter of law, the trial court erred in granting the 100% set-off without first determining the diminution in value. Id. at 27.
 {¶ 33} Although it was not expressly calculated, the diminution in value is certainly not 100% for a system that remains in operation; that is, this system must be worth something (even buried only eight inches deep), or it would not continue in operation. Therefore, the restoration cost in this case, being effectively 100% of the value of the installation, appears on its face to be "grossly disproportionate" to diminution in value. See Bartholet II, supra, at *4 (restoration cost of 50% was grossly disproportionate). Because Grafton did not produce any evidence on diminution in value when it had the burden to do so, on remand, the trial court need not conduct further proceedings, but may dismiss Grafton's affirmative defense claim and award the full value of the invoice. See Smith, supra, at ¶ 18. South Shore's third assignment of error has merit.
 Cross-Assignment of Error Number Four
"The trial court erred in reducing invoice 1836 (PX 11) for strand placement by 15% ($10,570.88) to compensate [Grafton] for additional main-tenance required, because of "noise" issues related to gilbert fittings and for referencing a difference in calculating the number of feet involved in the invoice."
 {¶ 34} South Shore makes two independent arguments. First, South Shore has argued that the trial court's partial denial of this particular claim is against the manifest weight of the evidence. We disagree. However, South Shore has also argued that the trial court applied the wrong remedy, and further, did so without sufficient proof. With this we agree.
 {¶ 35} As discussed above, factual determinations made by the trial court will be overruled if they are against the manifest weight of the evidence, and we grant a presumption that the trial court's findings of fact were correct to seek an interpretation consistent with the verdict. See Seasons Coal,10 Ohio St.3d at 80. The trial court made two statements in the journal entry regarding this invoice:
"[South Shore's] Exhibit 11 (invoice 1836) is for strand placement in the Eaton Township Rebuild. * * * This project also has `noise' issues which the evidence indicates is related at least in part to Gilbert fittings. Therefore, the Court will reduce the invoice by 15% to compensate [Grafton] for additional maintenance which was required. [South Shore] is entitled to $59,901.68 [a reduction of $10,570.88 from the invoice]."
Then, in closing, the trial court stated:
"Further [Grafton] has argued for additional costs of an employee who's job included replacement or repair of Gilbert fittings; as the Court has adjusted Exhibits 3, 11 and 17 by 15% to account for this problem, no further award is granted."
 {¶ 36} South Shore protests that this invoice regards strand, which does not carry signal, contain fittings or involve noise. Strand is the strong metal cable, strung between poles, to which the signal cable is attached because the signal cable is not strong enough to support its own weight. Grafton responds that it was at least partially the flaws in the strand that led to the problems with the fittings and the resulting noise. In reviewing the evidence on this issue, we cannot conclude that trial court clearly lost its way or created such a manifest miscarriage of justice that this factual determination must be overturned. SeeThompkins, 78 Ohio St.3d at 387. Furthermore, we are not persuaded to adjust the trial court's finding that the Main Line Technician for Grafton was required to commit 15% of his time to locating and tightening these fittings to eliminate this noise.
 {¶ 37} Despite our acceptance of the factual findings, we find the selected remedy insupportable. As the actual repair costs to tighten the fittings are unlikely to approach the diminution in value of a cable system aggravated by noise, in this instance we agree that repair costs represent the proper remedy. Pikewood Manor, 2004-Ohio-440, at ¶ 19. However, a 15% expenditure of one employee's time does not equate to a 15% reduction of the invoice. By our math, a 15% reduction of invoice 1836 is $10,570.88. To equate this to 15% of the cost of a Main Line Technician for the period of the invoice (22 days), is to find that a Main Line Technician earns an annual salary of over $1,169,203. We find it unlikely that Main Line Technicians are paid quite so handsomely.
 {¶ 38} Rather, we begin with Grafton's proffered testimony that a Main Line Technician earns an annual salary of $43,000 to $47,000 plus benefits. Even estimating a plus-benefit value of $60,000 per year, when we calculate 15% of that employee's time for the period of the invoice (22 days), we arrive at a reasonable set-off of $542. That is, we find it persuasive from the evidence presented at trial that Grafton expended $542 to remedy the noise in its system associated with invoice 1836. Without further evidence, we cannot conclude that Grafton is entitled to anything more. South Shore's fourth assignment of error has merit.
 Cross-Assignment of Error Number Five
"The trial court erred in finding that [grafton] was required to have the work done under invoice 1929 (px 14) redone by jem and therefore denying [south shore] 100% of invoice 1929 amount."
 {¶ 39} South Shore makes two independent arguments. First, South Shore has argued that the trial court's partial denial of this particular claim is against the manifest weight of the evidence. We disagree. However, South Shore has also argued that the trial court applied the wrong remedy, and further, did so without sufficient proof. With this we agree.
 {¶ 40} The trial court stated:
"[South Shore's] Exhibit 14 (invoice 1929) is for work done in Pheasant Run. [Grafton] was required to have this work re-done by JEM Enterprises due to quality of work issues. Therefore, [Grafton] has met its burden of proof as to this invoice, and no sum is awarded to [South Shore] [a set-off of 100%]."
 {¶ 41} Each side presents conflicting evidence and testimony as to whether JEM Enterprises actually re-did the work detailed in this particular invoice. Based on this conflicting evidence and our standard of review, as expressed fully above, we cannot conclude that the trial court clearly lost its way or created such a manifest miscarriage of justice such that this factual determination must be overturned. See Seasons Coal,10 Ohio St.3d at 80; Thompkins, 78 Ohio St.3d at 387.
 {¶ 42} However, we are similarly instructed by our above discussion on the appropriate remedy that the trial court did not apply the proper remedy in this instance. Once again we conclude that diminution in value was the appropriate remedy for the installation of this system. Ohio Collieries, 107 Ohio St. at paragraph five of the syllabus. Furthermore, determination of the diminution in value was a necessary step before awarding restoration costs, unless restoration costs were not grossly disproportionate. Bartholet I, 131 Ohio App.3d at 27;Bartholet II supra at pg. 6. In this case, where restoration costs were 100% of the value of the installation, we cannot avoid a finding that restoration costs were disproportionate and dictated a prior finding of diminution in value. See Smith,2004-Ohio-4866, at ¶ 18. South Shore's fifth assignment of error has merit.
 Cross-Assignment of Error Number Six
"The trial court erred when it deducted $4,867 from invoice 1931 (px 17), said amount being an arbitrary 15% of the invoice, for the reason that [grafton's] general manager testified that three items costing in the aggregate of $997 should not have been included in the invoice."
 {¶ 43} South Shore makes two independent arguments. First, South Shore has argued that the trial court's partial denial of this particular claim is against the manifest weight of the evidence. We disagree. However, South Shore has also argued that the trial court applied the wrong remedy, and further, did so without sufficient proof. With this we agree.
 {¶ 44} The trial court stated:
"[South Shore's] Exhibit 17 (1931) relates to the Eaton Township Rebuild. [Grafton] presented evidence relating to several portions of the bill and is entitled to a set-off. [Grafton's] evidence indicates that there was no existing plant to raise onto `j' hooks, that only 10 screws anchors were installed, and that the charge for tree trimming was not appropriate. Further, the noise issues related to improper installation of Gilbert fittings are evident in this area, thus there is an off-set of 15% deducted; [South Shore] is entitled to payment $26,732.13 [reduced $997.15; so that 15% set-off equals $4,717.44].
 {¶ 45} Following the same reasoning explained in assignment of error number four, we will not overturn the trial court's factual findings, but we must reverse the arbitrary remedy. SeeThompkins, 78 Ohio St.3d at 387; Pikewood Manor,
2004-Ohio-446, at ¶ 19. Again, the parties presented significant and often conflicting evidence on this issue and we are not persuaded that the trial court lost its way. However, we are convinced that 15% of the invoice amount does not equate to 15% of the cost of the employee engaged in the tightening of the fixtures to remove the noise from the system. South Shore's sixth assignment of error has merit.
 III {¶ 46} Grafton's two assignments of error are overruled. South Shore's first and second cross-assignments of error are overruled. South Shore's third, fourth, fifth and sixth cross-assignments of error are sustained. The judgment of the trial court is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.
Judgment affirmed in part reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Boyle, J. Concurs.
Slaby, J. Dissents with no Opinion.